SPECIALTY EQUIPMENT MARKET ASSOCIATION, Petitioner,

v.

William D. RUCKELSHAUS, Administrator, U.S. Environmental Protection Agency, et al., Respondents,

Motor Vehicle Manufacturers Association of the United States, Inc., Intervenor.

AUTOMOTIVE PARTS REBUILDERS ASSOCIATION, et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent,

Motor Vehicle Manufacturers Association of the United States, Inc., Intervenor.

MOTOR VEHICLE MANUFACTURERS ASSOCIATION of the UNITED STATES, INC., et al., Petitioners,

v.

William D. RUCKELSHAUS, Administrator, U.S. Environmental Protection Agency, Respondent.

AUTOMOBILE IMPORTERS OF AMERICA, INC., Petitioner,

v.

William D. RUCKELSHAUS, Administrator, U.S. Environmental Protection Agency, Respondent.

Nos. 81–1047, 81–1072, 81–1076 and 81–1083.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 9, 1983.

Decided Oct. 14, 1983.

---

**131.** Maj. op. at 101.

**132.** Lee, *The Path Along the Ridge: Regional Planning in the Face of Uncertainty,* 58 WASH.L. REV. 317, 322 (1983).

David J. Frantz, Washington, D.C., with whom Richard A. Mehler, Washington, D.C., Harold T. Halfpenny, Louis F. Marchese, and James F. Flanagan, Chicago, Ill., were on the joint briefs, for petitioners in 81–1072.

Matthew A. Low, Washington, D.C., with whom John Russell Deane, III, Washington, D.C., was on the brief, for petitioner in 81–1047. Mark S. Allen, Washington, D.C., also entered an appearance for petitioner.

James P. Clark, Attorney, E.P.A., of the Bar of the District of Columbia Court of Appeals, pro hac vice, by special leave of the Court, Washington, D.C., with whom Robert M. Perry, Gen. Counsel, E.P.A., Gerald K. Gleason, Asst. Gen. Counsel, Robert A. Weissman and Samuel I. Gutter, Attorneys, E.P.A., and David E. Dearing, Attorney, Dept. of Justice, Washington, D.C., were on the brief, for respondent.

Theodore Souris, Detroit, Mich., with whom George F. Ball, William L. Weber, William H. Crabtree, Charles H. Lockwood, Michael W. Grice, Detroit, Mich., Thomas L. Saybolt, Paula Winkler-Doman, Dearborn, Mich., Gerhard P. Riechel, John M. Brunner, Englewood Cliffs, New Jersey, and Milton D. Andrews, Lance E. Tunick, Washington, D.C., were on the joint brief for Petitioners in 81–1076 and 81–1083. Kenneth L. Gluckman, Southfield, Mich., also entered an appearance for Petitioner in 81–1076.

Before WRIGHT and MIKVA, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

Concurring opinion filed by Senior Circuit Judge MacKINNON.

MIKVA, Circuit Judge:

In 1970, Congress amended the Clean Air Act to require vehicle manufacturers to warranty the performance of their vehicles' emission control systems. Under this performance warranty program, vehicle manufacturers were allowed to condition their warranties on the owners' use of repair parts sold and installed by the vehicle manufacturers themselves. Such "tying" arrangements placed manufacturers of aftermarket parts—parts not installed originally on a new vehicle—at a competitive disadvantage. Congress therefore amended the performance warranty provisions in 1977 to protect hundreds of small businesses engaged in the production of aftermarket parts from this competitive disadvantage. The mechanism chosen by Congress to prevent vehicle manufacturers from establishing a monopoly on repair parts was a voluntary self-certification program under which parts manufacturers could certify that their parts would not cause a vehicle to exceed emission standards. Vehicle manufacturers, in turn, would be prohibited from denying a performance warranty claim on the basis that a part manufactured by someone else was used to repair or maintain the vehicle so long as that part was certified. Congress directed the Environmental Protection Agency (EPA or the agency) to effectuate such a mechanism.

This case involves several challenges to the regulations covering the self-certification of aftermarket parts, which were pro-

mulgated by the EPA pursuant to section 207(a)(2) of the Clean Air Act. Various members of the motor vehicle, motor vehicle parts, and automotive services industries sought review of the final agency rule and filed the petitions that have been consolidated for this appeal. Although we agree with some of the petitioners' challenges, we uphold the basic certification program established by EPA. We hold that the standards for and the scope of certification set forth in the regulations are valid. The more difficult tasks undertaken by EPA involved its efforts to fashion a reimbursement plan to protect vehicle manufacturers and the exclusion of certain parts from the certification program. Although EPA has authority under the Clean Air Act to require certified parts manufacturers to reimburse vehicle manufacturers for honoring warranty claims arising from the use of certified parts, EPA's proposed reimbursement scheme is inadequate. EPA's blanket exclusion of specialty parts * from the certification program and rejection of the use of short tests as a basis for certification were arbitrary and capricious. We remand to the agency for further development of the reimbursement scheme and to articulate a better rationale for precluding the use of short tests to determine eligibility under the certification program.

### BACKGROUND

This is one of three related cases involving the EPA's implementation of the performance warranty provisions of section 207 of the Clean Air Act, 42 U.S.C. § 7541 (1976 & Supp. V 1981) (the Act). *See Automotive Parts Rebuilders Ass'n v. EPA*, 720 F.2d 142 (D.C.Cir. 1983) and *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. Ruckelshaus*, 719 F.2d 1159 (D.C.Cir. 1983). A detailed description of the 1970 performance warranty provision and the 1977 amendments to that provision is set forth in *Automotive Parts,* at 145–148. We summarize that discussion briefly to provide sufficient background for understanding the Voluntary Aftermarket Part Self-Certification Rule (the certification rule or certification regulations) challenged in this case.

When Congress overhauled Title II of the Clean Air Act in 1970, it established stringent emission standards for vehicles and procedures for determining compliance with those standards. Section 202 of the Act established the basic emission standards which vehicles are required to meet, 42 U.S.C. § 7521; section 206 set forth an elaborate Federal Test Procedure (FTP) to determine whether new vehicles complied with those standards, *id.* § 7525; and section 207 of the Act applied the standards to vehicles already in use by imposing two mandatory warranty requirements on vehicle manufacturers to ensure that in-use vehicles complied with the emission standards. *Id.* § 7541. The first warranty is for design and workmanship. *See* Clean Air Act § 207(a)(1), 42 U.S.C. § 7541(a)(1). The second is a performance warranty that requires the vehicle manufacturer to pay for any necessary repairs when a vehicle that has been maintained and used in accordance with the manufacturers' instructions fails an EPA-approved "short test." *See* Clean Air Act § 207(b), 42 U.S.C. § 7541(b). *See also Motor Vehicle Manufacturers Ass'n* [hereinafter cited as *MVMA*], 719 F.2d 1159 (upholding the short tests adopted by EPA pursuant to section 207(b)). The short test does what its name implies— it provides a quicker, more practical method of testing vehicle emissions than the costly, time-consuming FTP used to measure emissions in new vehicles under section 206. Because the short test is a cruder method of measuring emissions, it tends to record only gross violations of emission standards;

---

* The aftermarket parts industry is comprised of two main components: replacement parts and add-on parts. Replacement parts, in turn, are comprised of maintenance replacement parts, which duplicate the original equipment, and modified replacement parts, which alter or go beyond the original equipment included in a new vehicle. Add-on parts are not found on a vehicle when it leaves the production line. Modified replacement parts and add-on parts are referred to collectively as "specialty parts."

nonetheless the Act requires that the short test be "reasonably capable" of being correlated with the FTP. 42 U.S.C. § 7541(b). *See MVMA,* at 151–152.

When it enacted the performance warranty program in 1970, Congress failed to consider the potential economic effect of the program on the aftermarket parts industry. Aftermarket parts—repair parts that are installed on used vehicles—are produced by independent parts manufacturers and by manufacturers of new vehicles. There are an estimated 1,700 independent parts manufacturers and 22,000 wholesalers and distributors in the automotive aftermarket. *See* Voluntary Aftermarket Part Self-Certification Regulations, 45 Fed.Reg. 78,449 (1980). After enactment of the emission warranties in 1970, vehicle manufacturers began requiring car owners to maintain and repair their emission-related components with the manufacturers' original equipment parts or with equivalent parts. *Id.* Because, at the time, there was no method for determining whether a part was "equivalent" to the original equipment from an emissions standpoint, the only way a vehicle owner could guarantee that his or her car would be eligible for free warranty repairs was to use the manufacturers' parts. *Id.* As a result, independent aftermarket parts manufacturers were placed at a competitive disadvantage.

After receiving complaints from independent aftermarket parts manufacturers (part manufacturers) about these anticompetitive effects of the performance warranty, EPA began to seek administrative solutions to the problem. In July 1973, EPA circulated a questionnaire to members of the aftermarket parts industry to determine the full extent of their concern over the anticompetitive effects of the warranty provision. *See* 38 Fed.Reg. 18,264 (1973) (reprinting the questionnaire). Working with the Automotive Liaison Council (ALC), an umbrella organization representing overlapping trade associations within the independent automotive aftermarket, EPA sought to develop a mechanism under which an aftermarket part manufacturer or rebuilder

could demonstrate that its parts were functionally equivalent, from an emissions standpoint, to the original equipment parts they were designed to replace.

In November 1974, EPA published an advance notice of proposed guidelines for a voluntary self-certification program. *See* Voluntary Self-Certification Program for Certain Aftermarket Parts, 39 Fed.Reg. 40,-192 (proposed November 14, 1974). The proposal had four primary objectives: (1) to identify those parts or components important to vehicle emission performance; (2) to develop standards or guidelines for those parts; (3) to publish the standards or guidelines so that aftermarket parts manufacturers could design and build their parts accordingly; and (4) to allow the parts manufacturers to represent that parts so built were "certified" to EPA standards. The ALC generally supported development of a voluntary certification program, although it criticized certain aspects of the specific program proposed by EPA. Two members of the ALC who are petitioners in this case—the Automotive Parts Rebuilders Association and the Automotive Service Industry Association—dissented from the ALC's support of a voluntary certification program, arguing that such a program would be fruitless without repeal or substantial modification of the warranty itself.

While EPA was beginning to develop a voluntary certification program, a congressional subcommittee conducted its own investigation into the anticompetitive effects of the warranty provisions. After extensive hearings, the Subcommittee on Environmental Problems Affecting Small Business of the House Permanent Select Committee on Small Business (the subcommittee) issued a report criticizing EPA's voluntary certification program and recommending congressional amendment of the warranty provisions. The subcommittee concluded that the warranties are "anticompetitive and provide the means by which the major vehicle manufacturers can monopolize the automotive aftermarket." *Monopolistic Tendencies of Auto Emission Warranty Provisions,* Report of the Subcommittee

on Environmental Problems Affecting Small Business, House Permanent Select Committee on Small Business, H.R. REP. NO. 1628, 93d Cong., 2d Sess. 30 (1974) [hereinafter cited as *Monopolistic Tendencies* Report]. The subcommittee found that, since the warranty ran only to original equipment or equivalent parts, the vehicle manufacturers could condition warranty claims on the use of their own replacement parts. Even in the absence of an express condition, consumers might believe that there was a benefit to using the vehicle manufacturers' own parts and services. The result could be a "psychological and financial tie-in between the new car-owner and the vehicle manufacturer's parts and franchised service outlets" for the life of the performance warranty. *Monopolistic Tendencies* Report at 30. Although the subcommittee encouraged EPA to pursue administrative remedies, it recommended that the statute be amended to reduce the length of the warranty. *See Automotive Parts,* at 146.

Based in part on the recommendations of the subcommittee, Congress in 1977 amended the performance warranty provisions as part of an extensive revision of the Clean Air Act. *See* Clean Air Act Amendments of 1977, Pub.L. 95–95, 91 Stat. 685, 751 (the 1977 Amendments). Congress "was concerned that unless certain preventive measures were put into effect prior to the effective date of the [performance] warranty, the warranty may result in anticompetitive effects harmful to small business, the free market and consumers as well." H.R. REP. No. 294, 95th Cong., 1st Sess. 21, U.S.Code Cong. & Admin.News 1977, pp. 1077, 1099 (1977). The 1977 Amendments limited the scope of the performance warranty after the first 24 months or 24,000 miles to certain emission control parts. 42 U.S.C. § 7541(b)(2). *See Automotive Parts,* at 152–155. They also amended section 207(b) to prohibit vehicle manufacturers from voiding warranties on the basis that a "certified" part was used. That section provides: "No such warranty shall be invalid on the basis of any part used in the maintenance or repair of a vehicle or engine if such part was certified as provided under

subsection (a)(2)." *Id.* § 7541(b)(2). Section 207(a)(2), in turn, requires the EPA to promulgate regulations under which parts manufacturers can, on a voluntary basis, certify that installation of their parts will not cause vehicles to fail to comply with applicable emission standards. Section 207(a)(2) provides in full:

> (2) In the case of a motor vehicle part or motor vehicle engine part, the manufacturer or rebuilder of such part may certify that use of such part will not result in a failure of the vehicle or engine to comply with emission standards promulgated under [section 202]. Such certification shall be made only under such regulations as may be promulgated by the Administrator to carry out the purposes of subsection (b) of this section. The Administrator shall promulgate such regulations no later than two years following [the date of the enactment of this paragraph].

*Id.* § 7541(a)(2).

Following receipt of oral and written comments on its proposed rule, EPA in November 1980 issued final certification regulations which established a part certification program (the certification program or program). Clean Air Act Emission Warranties; Voluntary Aftermarket Part Self-Certification Regulations, 45 Fed.Reg. 78,-448 (1980) (to be codified at 40 C.F.R. §§ 85.2112–.2122). According to EPA the primary purpose of the certification program is "to reduce the potential adverse economic impact on the automotive aftermarket industry that could result from implementation and enforcement of the Section 207 Clean Air Act emission warranties, while at the same time assuring that certified parts do not cause vehicles to exceed Federal emission standards." *Id.* The regulations establish a voluntary self-certification program under which parts manufacturers must notify and provide supporting information to EPA 45 days prior to sale of the parts they intend to certify. 40 C.F.R. § 85.2115(a) (1982). Any interested party may object to the certification of a part and the Administrator of EPA may postpone

certification pending an investigation. *Id.* § 85.2116. The regulations also provide for decertification of a part. *Id.* § 85.2121.

Under the regulations, any part "affecting emissions" is eligible for the certification program. 45 Fed.Reg. 78,450 (1980). The standard for certification is that the part not cause a vehicle to exceed the applicable emission standards contained in section 202 of the Act. *See id.* at 78,453. This reflects a change in EPA's proposed rule which would have required that a part cause *no increase* in emissions. *See* Voluntary Aftermarket Part Self-Certification Regulations, 44 Fed.Reg. 46,688 (proposed August 8, 1979).

The regulations provide two methods for determining whether a part will cause a vehicle to exceed emission standards. 40 C.F.R. § 85.2114 (1982). First, a part may be certified if it conforms to relevant "emission critical paramaters" set forth in the regulations. *See id.* § 85.2122. The emission critical parameters developed by EPA are based on an examination of original equipment to determine what design elements are important for emission control. A part may be certified if its parameters are equivalent to the parameters of the original part. The regulations specify thirteen emission-related parts that may be certified through the use of emission critical parameters, but EPA intends to expand the list as parameters are identified for other parts. *See* 45 Fed.Reg. 78,451 (1980). Under the second certification method, a part for which emission critical parameters have been designated may be certified by using the costly, time-consuming Federal Test Procedure used to demonstrate emission compliance at the time of sale. 40 C.F.R. § 85.2114(a)(2) and (b).

The agency rejected use of short tests as an alternative basis for certification. *See* 45 Fed.Reg. 78,452 (1980). Short tests are used under section 207(b) to determine whether an in-use vehicle exceeds emission standards, thereby triggering a performance warranty claim. But EPA concluded that the use of short tests for certification purposes would be "unwise." *Id.* The primary rationale offered by the agency was that short tests "do not, in themselves, demonstrate compliance with Federal Emission Standards." *Id.*

In its explanatory statement accompanying the final rule, EPA explained that "all emission-related components are eligible for the certification program." *Id.* at 78,451. For the time being, however, EPA explicitly excluded from the program aftermarket parts that alter or go beyond the original equipment included in a vehicle after production—known in the industry as "specialty parts." According to EPA, the exclusion of specialty parts was not a final determination, but was necessary "[f]or the present" because no emission critical parameters had been identified for such parts. *Id.*

In addition to certifying its parts through either the FTP or emission critical parameters methods, a manufacturer must label its parts with an identification symbol or with the name of the manufacturer and the words "Certified to EPA Standards." 40 C.F.R. § 85.2119 (1982). The regulations do not require labels to be durable nor do they prevent more than one parts manufacturer from using the same symbol.

As a further condition of certification, a parts manufacturer must adhere to a reimbursement warranty, under which it asserts that its parts, if properly installed, will not cause a vehicle to exceed emission standards as determined by an EPA-approved short test. *Id.* § 85.2117(a). Under this warranty, a parts manufacturer is required to reimburse a vehicle manufacturer for "all reasonable expenses" incurred whenever a "valid" warranty claim arises because of the failure of the certified part. *Id.* § 85.-2117(b). The regulations do not specify how disputes between vehicle and parts manufacturers concerning reimbursement should be resolved, nor do they define "reasonable expenses" or a "valid" warranty claim.

Following publication of the regulations in the Federal Register, representatives of various segments of the vehicle manufacturers, parts manufacturers, and automo-

tive services industries filed separate actions in this court for judicial review of the final certification rule. The Motor Vehicle Manufacturers Association of the United States, a trade association, several vehicle manufacturers, and the Automobile Importers of America [hereinafter referred to collectively as MVMA or the vehicle manufacturers] claim that the certification standards are unlawful, that the proposed reimbursement scheme is arbitrary and capricious, and that the imposition of liability on vehicle manufacturers for warranty claims arising from the use of certified parts is not authorized by law and amounts to a taking of property without just compensation. *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. Ruckelshaus*, No. 81–1076 and *Automobile Importers of America v. Ruckelshaus*, No. 81–1083. The Automotive Parts Rebuilders Association and the Automotive Services Industry Association [hereinafter referred to as APRA] claim that the scope of the certification program is too broad and that the reimbursement scheme exceeds EPA's statutory authority. *Automotive Parts Rebuilders Ass'n v. EPA*, No. 81–1072. The Specialty Equipment Market Association (SEMA) claims that EPA's exclusion of specialty parts from the certification program was arbitrary and capricious, an abuse of discretion, and not in accordance with law; that the agency's rejection of short tests as a basis for certification was arbitrary and capricious; that the regulations unconstitutionally discriminate against specialty parts manufacturers; and that EPA failed to provide adequate notice that it would exclude specialty parts from the certification program. *Specialty Equipment Marketing Ass'n v. Ruckelshaus*, No. 81–1047. We approach these various claims through a consolidated review of the certification regulations.

## DISCUSSION

Congress granted the EPA considerable discretion to develop the details of a voluntary self-certification program for parts manufacturers. Section 207(a)(2) directs the Administrator of EPA to promulgate regulations "to carry out the purposes" of

section 207(b), the performance warranty provision. EPA correctly identified the purpose of the certification program—to reduce the anticompetitive effect of the emission warranties on the aftermarket parts industry, while ensuring that certified parts are subject to the stringent emission standards contained in the Clean Air Act. Thus, although the certification program can help redress the disproportionate economic impact of the emission warranties, the overriding goal of the statute remains the same—to protect the public from excessive pollution of the air. In general, EPA's self-certification regulations serve these dual purposes successfully. In two important respects, however—the structure of the reimbursement scheme and the exclusion of specialty parts from the certification program—EPA has acted arbitrarily and capriciously by failing to address adequately the practical effect of its regulations on large segments of the motor vehicle and aftermarket parts industries.

To simplify our discussion we have divided the claims made by petitioners into four general categories: (1) the standard for certification; (2) the scope of the certification program; (3) the treatment of specialty parts in the regulations; and (4) the reimbursement scheme.

### A. Standard of Review

Before addressing any of petitioners' claims, we must first set forth the appropriate standard of review. Section 307(d) of the Act, 42 U.S.C. § 7607(d)(9), contains the judicial review provisions which apply to regulations proposed after November 5, 1977. *See* 42 U.S.C. § 7607(d)(11). We may reverse the agency's action if it was: (1) arbitrary, capricious, an abuse of discretion or not in accordance with law; (2) contrary to constitutional right, power, privilege or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or (4) reached without observing procedures required by law.

Many of petitioners' claims require us to determine whether EPA's regulations are authorized by, and in accordance with, the commands of the Clean Air Act. Our task is to decide whether the agency's interpretation is "sufficiently reasonable" as to be acceptable. *FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981) (quoting *Train v. Natural Resources Defense Council,* 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975)); *American Paper Institute, Inc. v. American Electrical Power Service Corp.,* —— U.S. ——, 103 S.Ct. 1921, 1933, 76 L.Ed.2d 22 (1983). We need not find "that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Democratic Senatorial Campaign Committee,* 454 U.S. at 39, 102 S.Ct. at 46. However, we must adhere to our role as the reviewing court and reject any agency interpretation of a governing statute that is "inconsistent with the statutory mandate or that frustrate[s] the policy that Congress sought to implement." *Id.* at 32, 102 S.Ct. at 42. *See, e.g., Public Service Commission of New York v. Mid-Louisiana Gas Co.,* —— U.S. ——, ——, 103 S.Ct. 3024, 3035, 77 L.Ed.2d 668 (1983) (overturning the Federal Energy Regulatory Commission's interpretation of the Natural Gas Policy Act of 1978 because the interpretation was "contrary to the history, structure, and basic philosophy of the [Act]").

Most of petitioners' other claims require us to review EPA's factual and policy determinations and decide if they were arbitrary and capricious. With regard to those claims, we must make a substantial and searching inquiry to ensure that the agency's decisions are the product of reasoned thought and based upon a consideration of relevant factors. *See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* —— U.S. ——, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983); *American Friends Service Committee v. Webster,* 720 F.2d 29, at 60, No. 81–1735 (D.C.Cir. Sept. 30, 1983). We must be assured that EPA "has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent." *Lead Industries Ass'n v. EPA,* 647 F.2d 1130, 1146 (D.C.Cir.1980) (quoting *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 850 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971)), *cert. denied,* 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980). In particular, we must ensure that EPA has explained carefully the reasons for its decisions. *Id.* at 1147. As we have stated previously: "[t]he paramount objective is to see whether the agency, given an essentially legislative task to perform, has carried it out in a manner calculated to negate the dangers of arbitrariness and irrationality in the formulation of rules for general application in the future." *Id.* (quoting *Automotive Parts & Accessories Ass'n, Inc. v. Boyd,* 407 F.2d 330, 338 (D.C.Cir.1968)).

With these considerations in mind, we turn to the voluntary aftermarket part self-certification rule challenged in this case.

### B. *Analysis*

#### 1. *Standard for Certification*

The vehicle manufacturers challenge the standards adopted by EPA to determine whether a part may be certified. First, the vehicle manufacturers claim that the regulations fail to require, as a prerequisite to certification, that a part be durable enough to ensure continued compliance with emission standards. Second, they contend that the proper standard should be that a part not cause *any* increase in emissions rather than the standard set forth in the regulations—that a part not cause a vehicle to exceed the applicable emission standards. We reject both of these claims.

MVMA's claim that the regulations fail to establish any durability criteria as a prerequisite to certification is incorrect. The regulations explicitly provide: "Before a part may be certified ... evidence must exist to demonstrate that the part will not cause a vehicle to exceed emission standards during the full interval for which the part is to be certified." 40 C.F.R. § 85.2114(d)

(1982). The regulations contain specific durability criteria for ten of the thirteen parts for which emission critical parameters are established and permit the use of reasonable engineering analyses or testing to demonstrate durability of the other parts. *See id.* §§ 85.2114(d)(2) and (3). These durability criteria are an important element of the certification program. They ensure that a part will meet certification standards, not only at the time of installation, but for an extended period of time after that. As EPA explained in its statement accompanying the final rule:

> The Agency believes that it is imperative that only durable parts be certified. Otherwise it would be possible for properly certified parts to deteriorate in use so as to cause a vehicle to exceed emission standards and perhaps cause the failure of other components. If this were to happen, vehicle manufacturers could incur unwarranted ... emission warranty expenses.

45 Fed.Reg. 78,452 (1980). The regulations properly reflect this concern.

■ MVMA's claim that EPA's emission standard for certification is unlawful is also without merit. Initially, EPA proposed a "no-increase" standard for certification. *See* 44 Fed.Reg. 46,688–89 (1979). Under that standard a part manufacturer would have to certify that the part would not cause *any* increase in a vehicle's emissions. The final rule rejected the no-increase approach and required instead that the part not cause a vehicle to exceed applicable emission standards. *See* 40 C.F.R. § 85.-2113(i) (1982) (emission critical parameters are those which "will not cause the vehicle to exceed applicable emission standards with such parts installed"); *id.* § 85.-2114(b)(2) (under the FTP standard for certification, parts "will not cause the vehicle to fail to meet any applicable Federal emission requirements...."). MVMA contends that the no-increase standard is required by the Act. We disagree and find that EPA's final version of the certification standard is consistent with the language of the statute and the legislative history of the certification provision.

The standard for certification is the one clear directive Congress provided when it gave EPA broad discretion to promulgate certification regulations. Section 207(a)(2) provides: "the manufacturer or rebuilder of such part may certify that use of such part *will not result in a failure of the vehicle or engine to comply with emission standards promulgated under [section 202]*." 42 U.S.C. § 7541(a)(2) (emphasis added). EPA's standard is consistent with this language, if not required by it. The statute says nothing about prohibiting certified parts from causing *any* increase in emissions; its only concern is that a vehicle comply with emission standards.

We recognize that the language of a statute may not support an agency's interpretation where the statutory context or legislative history indicates that Congress intended a different result. The legislative history in this instance, however, supports EPA's interpretation of the Act. MVMA does not cite any language supporting a no-increase standard of certification. Instead it points only to statements in the Senate Committee and Conference Committee reports indicating that aftermarket parts must meet the performance standards of the original equipment. *See* SEN.REP. No. 127, 95th Cong., 1st Sess. 81 (1977); H.R. REP. No. 564, 95th Cong., 1st Sess. 167 (1977) (conference committee report), *reprinted in* 1977 U.S. CODE CONG. & AD.NEWS 1548. But those standards are met if a part does not cause a vehicle to exceed the Act's emission standards. The same committee reports, upon which MVMA relies, support EPA's interpretation of the Act. According to the report of the Senate Committee on Environment and Public Works, which accompanied the 1977 Amendments, "[t]he independent manufacturer of parts is authorized to certify to the customer that the part will not 'result in a failure of the vehicle or engine to comply with emission standards.'" SEN.REP. No. 127, 95th Cong., 1st Sess. 82, U.S. CODE CONG. & ADMIN.NEWS 1977, p. 1160 (1977). Similarly, the conference committee report expressly adopted the language providing that certified parts

"not . . . result in a failure of an engine to comply with emission standards." H.R. REP. No. 564, 95th Cong., 1st Sess. 168 (1977), *reprinted in* 1977 U.S. CODE CONG. & AD.NEWS 1549.

MVMA also contends that EPA's standard will result in higher emissions, thereby causing vehicles to fail emission tests more frequently—a result which is contrary to the purposes of the Clean Air Act. Although no single part would cause a vehicle to fail a short test under EPA's standard, MVMA argues that several certified parts, each of which causes only some increase in emissions, together might result in such a failure. Because of this so-called "stacking" problem, the vehicle manufacturers are concerned that their warranty liability will be triggered when a vehicle fails a short test because of the use of several aftermarket parts where no single part manufacturer would be responsible directly for the emissions failure. In that case, no part manufacturer could be identified to reimburse the vehicle manufacturer.

Under the certification program approved by EPA, however, such a result is entirely speculative. The emission critical parameters adopted by EPA for individual parts are those which "should establish that a part is equivalent to the OE [original equipment] part from an emissions standpoint." 45 Fed.Reg. 78,452 (1980). MVMA's speculative assertion is insufficient to justify straying from the clear command of the statutory language and legislative history.

### 2. *Scope of Certification*

Petitioner APRA objects to the broad applicability of the certification program to all parts *affecting* emissions. Under the final regulations, "all emission-related components" are eligible for certification. *Id.* at 78,451. For the time being, only those 13 parts for which emission critical parameters have been identified may be certified, but EPA plans to develop standards for certifying other parts affecting emissions in the future. *Id.* EPA's justification for applying the certification program broadly was based on its recognition that a part can

affect emissions both directly and indirectly, by adversely affecting *another* part which, in turn, causes an increase in emissions. *Id.* at 78,448. According to the agency, "Congress was well aware that . . . items, such as spark plugs, air cleaner elements, etc., impact upon a vehicle's ability to meet applicable emission standards and might be cited as a basis for denying an emission warranty claim at any time during a vehicle's useful life." *Id.* at 78,450.

■ APRA disagrees, asserting that the Act only permits certification of parts which were installed for the *primary purpose* of reducing emissions (primary parts) and that the regulations therefore exceed EPA's statutory authority. APRA advances two major arguments in support of its narrower reading of the statute. The first is based on its interpretation of the scope of the section 207(b) warranty; the second is based on the alleged anticompetitive effects of the broad certification program favored by EPA. We reject both of these claims and hold that EPA's conclusion—that Congress intended the certification program to extend to all parts affecting emissions—is a proper interpretation of the Act.

APRA claims that the certification program is limited to those parts covered by the performance warranty under section 207(b), which it reads to include only primary parts. In light of our holding today in *Automotive Parts,* this argument must fall. In that case we reject APRA's interpretation of the scope of the performance warranty and uphold EPA's application of the warranty to all parts affecting emissions for the first 24 months or 24,000 miles of a vehicle's useful life. At 151–152. Only after 24 months or 24,000 miles is the performance warranty limited to primary parts; even then, EPA has the authority to require vehicle manufacturers to repair or replace, free of charge, *any* component that causes the primary part to fail. *Id.* at 153; *see also* 40 C.F.R. § 85.2107 (1982) (defining the remedies required in case of the failure of a primary part). Because the section 207(b) warranty runs to parts af-

fecting emissions, the certification program must extend to such parts in order for the regulations to "carry out the purposes" of section 207(b). 42 U.S.C. § 7541(a)(2). If only primary parts could be certified under the regulations, vehicle manufacturers could tie their honoring a warranty claim to the use of their own secondary parts. This is the very result the certification provision was designed to prevent. Nothing in the language of section 207(a)(2) or the legislative history of the 1977 Amendments indicates that Congress intended to limit the scope of the certification program to primary parts.

APRA also argues that the certification regulations are anticompetitive because they coerce small parts manufacturers into incurring the financial burden of certification rather than face the competitive disadvantage that would flow from the failure to certify their parts. According to APRA, parts manufacturers that are unable to certify because of the expense of the certification program will suffer a competitive disadvantage with respect to those parts that are certified.

Congress made clear that the purpose of the certification program is to enable parts manufacturers to compete more effectively with vehicle manufacturers. It is true that a financially prohibitive certification procedure would counteract the competitive advantages of certification, and Congress intended to keep the costs of certification low enough so that small parts manufacturers could participate. But Congress never indicated that it intended to exclude whole categories of parts from the certification program. The fact that those parts manufacturers who choose not to certify their parts will suffer a competitive disadvantage compared to those who do certify is the inevitable result of a voluntary certification program. Because the purpose of the program is to enhance the competitive position of all independent parts manufacturers, vis-a-vis the automobile manufacturers, the scope of the program should be broad. The eligibility of all parts "affecting emissions" for certification is a proper interpretation of the Act.

### 3. Exclusion of Specialty Parts from the Certification Program

Petitioner SEMA challenges the exclusion of specialty parts from the certification program. SEMA's dispute with EPA centers on two separate actions by the agency: its explicit exclusion of specialty parts from the certification program and its rejection of the use of short tests as an alternative method of certification. The latter action had the practical effect of making certification inaccessible to specialty parts manufacturers. We agree with SEMA that the explicit exclusion and de facto exclusion of specialty parts (through the rejection of short tests for certification purposes) were arbitrary and capricious.

Under EPA's proposed rule, *all* aftermarket parts affecting emissions would have been eligible for certification. *See* 44 Fed. Reg. 46,688 (1979). This is true, at least theoretically, in the final rule as well. According to EPA, "to carry out the purpose of Section 207(b) it is important that no parts affecting emissions be excluded from the Part Certification Program." 45 Fed. Reg. 78,450 (1980). Yet, under the final regulations, only those parts "for which emission critical parameters ha[d] been set forth" may be certified, at least for the present. 40 C.F.R. § 85.2112(a) (1982); *see also* 45 Fed.Reg. 78,451 (1980). Because no emission critical parameters were identified for specialty parts, EPA excluded them from the program, reserving judgment on whether they should be excluded permanently. 45 Fed.Reg. 78,451 (1980). In a separate action, EPA rejected the use of short tests as an alternative basis for certification, even though short tests appeared to be the only available testing method that would make certification accessible to specialty parts manufacturers. *See id.* at 78,-452–53.

■ We agree with most of SEMA's substantive challenges to the regulations. As a preliminary matter, however, we reject SEMA's procedural claim that specialty parts manufacturers had inadequate notice

and opportunity to comment on EPA's exclusion of their parts from the certification program. In its proposed rule, EPA explicitly asked for comments on the role of specialty parts:

> Of greater concern was the question of whether modified and add-on parts should be eligible for certification. As presently drafted, the proposal would allow these parts to be certified if they will have no immediate or long term adverse effect on emissions.
>
> . . . .
>
> . . . The Agency invites public comment on the inclusion of "modified" and "add-on" parts in this program.

44 Fed.Reg. 46,688 (1979). In light of this "invitation", it is clear that specialty parts manufacturers had sufficient opportunity to comment on the inclusion of their parts in the program.

As to SEMA's substantive claims, we first address EPA's de facto exclusion of specialty parts through its rejection of short tests as a method of certification. Our opinion in the companion case of *MVMA v. EPA* explains the central role of EPA-approved short tests under the performance warranty program. Short tests are used to determine whether an in-use vehicle exceeds emission standards, thereby triggering the vehicle manufacturer's warranty under section 207(b). Specialty parts manufacturers recommended that EPA use short tests under the certification program as well. Because specialty parts, by definition, differ from and go beyond original equipment parts, it is not possible to develop emission critical parameters for them that are comparable to the original equipment. Moreover, the cost of the FTP makes it an impractical method of certification for most small parts manufacturers. SEMA indicated during the comment period on the proposed certification rule that it favored the use of short tests as an alternative method of certification, at least until a better test was developed to measure specialty part emissions.

▇ Although couched in policy terms (the use of short tests as a basis for certifi-

cation would be "unwise"), EPA's rejection of short tests for certification purposes apparently rests on its interpretation of section 207(a)(2). *See* 45 Fed.Reg. 78,452–53 (1980). According to EPA, "the short tests do not, in themselves, demonstrate compliance with Federal Emission Standards." *Id.* at 78,452. Quoting the language of section 207(a)(2), EPA argued that, since short tests only indicate gross violations of emission standards, "mere compliance with a short test would not allow a manufacturer to certify 'that use of such part will not result in a failure of the vehicle or engine to comply with emission standards promulgated under section 202' as is set forth in the Act." *Id.* Although the Act's certification provision does refer directly to the strict emission standards set forth in section 202, EPA ignores the other command of section 207(a)(2), which requires the agency to promulgate regulations "to carry out the purposes" of section 207(b), the very provision which authorizes EPA to develop a short test for use in the performance warranty program.

It is true that a short test will not indicate as many violations of emission standards as will the Federal Test Procedure, but Congress intended, in section 207(b), to provide a reasonably comparable surrogate for testing in-use vehicles in order to determine whether the performance warranty is triggered. If the short test we approved in *MVMA* is the only basis upon which a vehicle manufacturer will be required to honor a performance warranty, it is unreasonable to require a part to meet more stringent emission standards before it can be certified. In rejecting the use of short tests for certification, while adopting such tests for determining warranty liability, EPA prevents parts from being certified that would not cause a vehicle to fail a short test and therefore would not trigger a vehicle manufacturer's warranty. Given that Congress intended the certification program to be broad in scope—an interpretation which EPA itself adopts—EPA's conclusion that section 207(a)(2) prevents the use of short tests as a basis for certification is incorrect.

This conclusion does not mean that the Act *requires* EPA to authorize the use of short tests as a basis for certification. The statute grants EPA considerable discretion in developing an inexpensive, technically feasible certification program. There may be valid policy reasons for rejecting short tests, but they have not been articulated by EPA. The only policy rationale advanced by the agency when it promulgated the rule is that none of the approved short tests approved under the performance warranty program measure $NO_x$, emissions which are regulated under section 202. 45 Fed.Reg. 78,452–53 (1980). This argument is specious in light of EPA's position before this court in *MVMA* urging us to approve those short tests, for performance warranty purposes, even though they do not measure $NO_x$. Moreover, the agency did not explain why other short tests which *do* measure $NO_x$ could not be used in the certification program.

One of EPA's initial justifications for rejecting short tests under the proposed certification program was that short tests were unable to guarantee that a part would cause no increase in emissions. 44 Fed.Reg. 46,690 (1979). Once EPA rejected the no-increase certification standard for replacement parts, however, that justification evaporated. EPA's own reasoning in the proposed rule, in the final rule, and in adopting the short tests we approve today for performance warranty purposes, demonstrates that the rejection of short tests for certification of parts was arbitrary and capricious.

SEMA also challenges EPA's explicit exclusion of specialty parts from the certification program. The regulations limit eligibility for certification to those parts for which emission critical parameters have been identified. EPA offered two reasons for this explicit exclusion of specialty parts. First, "[v]ehicle manufacturers do not believe they should be held responsible for such parts under the emission warranty." 45 Fed.Reg. 78,451 (1980). Obviously, a party's "belief" cannot substitute for the reasoned analysis required before we can

uphold the agency. Second, EPA relied on the testimony of specialty parts manufacturers themselves, who stated that full testing under the FTP "would be so time-consuming and expensive that absent an alternative method of certification, the Proposal did not provide a realistic opportunity for the certification of add-on or modified parts." *Id.* EPA therefore apparently assumed that specialty parts manufacturers did not want to use the FTP as a method for certification.

SEMA does not dispute that the FTP is an unrealistic method of certification on a permanent basis, but claims that it expected specialty parts to be included in the program even if the FTP were the only permissible basis for certification. In fact, EPA adopted one of SEMA's suggestions to lessen the burden of the FTP by reducing the number of required tests from four to two. 45 Fed.Reg. 78,453 (1980). (Indeed, the agency added insult to injury when it refused to allow specialty parts to be certified because of the cost of the FTP and then adopted SEMA's suggestions for reducing that cost for those parts which EPA did include in the program.) Unless the agency offers persuasive reasons for its decision, specialty parts manufacturers, at a minimum, should be allowed to participate in the certification program through the FTP method of certification.

The EPA's blanket exclusion of specialty parts from the certification program and its rejection of the use of short tests as a basis for certification were arbitrary and capricious. Although the agency's reasoning in support of the final certification regulations generally reflected a sensitive balancing of the competing and often conflicting purposes of the statute, such a reasoned analysis was lacking with regard to specialty parts. EPA's treatment of specialty parts was inconsistent with the remainder of the certification regulations, with the short test regulations, and with the performance warranty regulations promulgated pursuant to section 207(b) of the Act. *See* 40 C.F.R. §§ 85.2201–.2218 (1982) (short test regula-

tions); *id.* §§ 85.2101–.2111 (performance warranty regulations).

In the final certification regulations, EPA concluded that the Act contemplates a certification program that is readily accessible to *all* aftermarket parts producers. Although there may be valid policy reasons for excluding specialty parts from the program, those reasons have not been articulated by EPA. The agency's treatment of specialty parts in the regulations—through its blanket exclusion of specialty parts and its rejection of the use of short tests—is inconsistent with its conclusion that all parts manufacturers are covered by section 207(a)(2).

### 4. The Reimbursement Scheme

■ Petitioners MVMA and APRA challenge the reimbursement scheme set forth in the regulations. As a condition of certification, a parts manufacturer must warrant to vehicle manufacturers that its part will not cause a vehicle to exceed emission standards. 40 C.F.R. § 85.2117(a) (1982). Under this warranty, the parts manufacturer is liable for all costs incurred by vehicle manufacturers because of the failure of a certified part under section 207(b). The regulations require parts manufacturers to reimburse the vehicle manufacturers for these costs:

> The aftermarket part manufacturer's minimum obligation under this warranty shall be to reimburse vehicle manufacturers for all reasonable expenses incurred as a result of honoring a valid emission performance warranty claim which arose because of the use of the certified aftermarket part.

*Id.* § 85.2117(b) (1982). Although EPA acted within its statutory authority in requiring such reimbursement, we find the scheme set forth in the regulations to be unworkable in several respects. Because EPA failed to address adequately the legitimate concerns raised by both vehicle and parts manufacturers during the comment period, we hold that promulgation of the reimbursement scheme was arbitrary and capricious.

We agree with EPA that it acted within its statutory authority in developing a reimbursement scheme, even though the statute does not specifically authorize such a scheme. Section 301 of the Clean Air Act authorizes EPA to prescribe regulations that are necessary to carry out the purposes of the Act. 42 U.S.C. § 7601(a)(1). The reimbursement scheme envisioned by EPA would effectuate the purposes of the performance warranty and certification provisions of the Clean Air Act. As we explain today in our opinion in *Automotive Parts,* section 207(b) flatly prohibits vehicle manufacturers from denying a performance warranty claim on the basis of the use of *any* certified part, even if the part is defective. At 159–162. Congress did not want consumers caught in the middle of disputes between parts and vehicle manufacturers over who is responsible for an emissions failure. If vehicle manufacturers could deny a warranty claim by asserting that an aftermarket part caused the car to fail a short test, consumers would have no incentive to buy parts from independent manufacturers. *See* SEN. REP. No. 127, 95th Cong., 1st Sess. 82 (1977) ("The threat of such conflict might otherwise induce owners to avoid nonoriginal parts in favor of original equipment parts."). The anticompetitive effects would be comparable to those Congress intended to eliminate through the certification program.

Contrary to MVMA's assertions, EPA has not imposed vicarious liability on vehicle manufacturers for the failure of parts made by another manufacturer. As we explain today in *Automotive Parts,* EPA's regulations simply require a vehicle manufacturer to honor a valid warranty claim and then obtain reimbursement from the manufacturer of the defective part that triggered the warranty. Our approval of the broad performance warranty established by EPA is conditioned on EPA's development of a workable reimbursement scheme. At 161 n. 80.

Although EPA may adopt a reimbursement scheme to serve the purposes of the Act, we cannot endorse its failure to devel-

op the details of such a scheme. It is unreasonable for the agency to *require* reimbursement as a condition for certification without setting forth some mechanism for resolving the disputes which inevitably will arise as a result of that requirement. After developing a detailed regulatory scheme for the certification of parts, EPA put forth only a broad outline of a reimbursement scheme and told the members of the affected industries to figure out the rest for themselves.

Petitioners MVMA and APRA challenge various aspects of the regulations which relate to the reimbursement scheme. Both criticize the lack of a dispute resolution mechanism and the vagueness of the reimbursement liability terms contained in the regulations. MVMA further argues that EPA should require parts manufacturers to demonstrate their ability to reimburse vehicle manufacturers as a condition for certification, and contends that the labelling and identification requirements for certified parts are inadequate. We consider each of these arguments in turn.

### (a) *Establishment of a Dispute Resolution Mechanism*

One of the major complaints advanced by the vehicle manufacturers is the absence of any mechanism for resolving disputes between parts and vehicle manufacturers over the liability for and amount of reimbursement owed in a particular case. There is no forum for resolving such disputes and no remedy available to the vehicle manufacturers to enforce the obligations that the regulations impose upon manufacturers of certified parts. EPA contends that the parties. can go into district court to resolve any reimbursement disputes and that no other forum is required. Moreover, the agency contends that the threat of decertification is a sufficient incentive for parts manufacturers to honor their reimbursement obligations. *See* 40 C.F.R. § 85.2121(a)(1) (1982).

EPA's position is unconvincing. Resort to district court is costly and time-consuming; in many cases it will be cheaper for the vehicle manufacturer to bear the full cost of the performance warranty than to engage in litigation over reimbursement for a particular repair. EPA concedes that the cost of litigating in federal court may be prohibitive, but concludes that the industry can create alternative remedies as it sees fit. We disagree. If reimbursement is to be a mandatory element of the certification program, then EPA must provide some forum for resolution of reimbursement disputes. EPA suggested before this court that arbitration might be one alternative mechanism for determining and enforcing reimbursement obligations. Establishing an arbitration procedure or similar forum for resolving disputes might be a reasonable implementation of the certification program. But it is for the agency to devise the precise contours of a dispute resolution mechanism subject to judicial review. Without some such mechanism, the reimbursement scheme, along with those portions of the performance warranty regulations that require vehicle manufacturers to honor a warranty claim caused by the failure of a defective certified part, cannot be sustained.

### (b) *The Terms of the Reimbursement Warranty*

Under the regulations, parts manufacturers are obligated to provide reimbursement for "all reasonable expenses" incurred as a result of honoring a "valid" performance warranty claim which arose "because of" the use of a certified part. 40 C.F.R. § 85.2117(b) (1982). The terms "reasonable expenses" and "valid emission performance warranty claim" are nowhere defined in the regulations, but are likely to become terms of art under the reimbursement scheme. MVMA and APRA contend that these terms are too vague to provide meaningful guidance to those engaged in a reimbursement dispute. We agree that EPA has failed to respond adequately to their concerns. EPA should apply its expertise in this area and flesh out these terms in the regulations to give guidance to parts and vehicle manufacturers. Alternatively, these terms could be clarified through the

adversarial process in the forum selected by EPA to resolve disputes. Whatever method is chosen, EPA must make a reasonable effort to minimize the ambiguities that could lead to costly, protracted disputes over the amount of money owed in particular cases.

### (c) Financial Stability of Parts Manufacturers

MVMA argues that EPA should require parts manufacturers to demonstrate their financial stability before being allowed to certify their parts. Without reasonable assurances that parts manufacturers are financially able to meet potential reimbursement obligations, MVMA believes vehicle manufacturers will incur expenses because of the failure of a certified part and never obtain reimbursement. Specifically, MVMA recommends that parts manufacturers be required to post bonds or otherwise demonstrate their ability to pay as a condition of certification.

In rejecting this suggestion in the final regulations, EPA countered that the financial instability of certified parts manufacturers is purely speculative. 45 Fed.Reg. 78,457 (1980). The agency indicated its willingness to alter the regulations if specific evidence is presented indicating the occurrence or potential occurrence of significant problems in this area. _Id._ at 78,458. We find this to be an adequate explanation of EPA's action and a reasoned application of the statute.

A central purpose of the certification regulations is to make certification as quick and inexpensive as possible so that small parts manufacturers will be able to overcome the competitive disadvantage of the performance warranty program. _See_ 45 Fed.Reg. 78,449 (1980) ("EPA has purposefully structured the program so that any party who manufactures sound parts and uses reasonable quality control should be able to certify with minimal expense or difficulty."). Posting a bond could have anticompetitive effects on small businesses in the aftermarket parts industry even though their parts may be qualitatively superior—from an emissions standpoint—to parts manufactured by companies that can afford to post bond. Given the pro-competitive purposes of the certification provision and the lack of any evidence suggesting widespread bankruptcies by small parts manufacturers, EPA's decision not to require parts manufacturers to demonstrate their financial stability is consistent with the statute.

### (d) Labelling and Identification of Certified Parts

MVMA claims that the regulations provide inadequate procedures for identifying the manufacturers of defective certified parts. EPA faced a difficult balancing task when it set forth labelling requirements for certified parts. On the one hand, if labelling requirements are too intricate and costly, small parts manufacturers may not be able to afford to certify. On the other hand, unless the manufacturer of a given part can be identified from the label, vehicle manufacturers may be unable to determine which company manufactured a defective part and thus may never recover their reimbursable expenses.

Although EPA properly was concerned about the labelling costs for small parts manufacturers, MVMA claims that the agency refused to adopt inexpensive procedures that would facilitate identification of a parts manufacturer. First, MVMA challenges EPA's failure to require that an identification symbol be permanent. EPA concedes that the symbols should be permanent, but contends that any vehicle manufacturer that believes a label is not sufficiently durable may object to the certification of that part. Such a procedure would require vehicle manufacturers to review every notice of intent to certify a part that is filed with EPA. If EPA is setting forth detailed labelling requirements as a condition of certification, it makes no sense to leave out the one requirement that would make the labelling effective: a guarantee that the label will be durable. The agency should not place the burden on vehicle manufacturers to check every notice of intent to

certify a part when the agency itself concedes that the labels should be permanent. Because EPA concedes that a symbol should be durable, its failure to impose such a requirement cannot pass muster.

MVMA's second claim is that the agency failed to require that the same or similar symbols be used by only one manufacturer to ensure identification of the appropriate parts manufacturer. EPA concedes that such a requirement makes sense in light of the purposes of the labelling requirement, but claims that the issue was not raised during the rulemaking proceeding and is therefore not properly before this court. We agree. Section 307(d)(7)(B) of the Act precludes this court from considering objections to rules or procedures if they were not raised in a timely manner before the agency. 42 U.S.C. § 7607(d)(7)(B). Because MVMA concedes that it did not challenge EPA's failure to prevent the use of similar identification symbols during the comment period, we lack jurisdiction to consider its claim.

## CONCLUSION

The EPA, with minimal guidance from Congress, has promulgated the certification regulations mandated by section 207(a)(2) of the Clean Air Act. The agency faced a difficult task in balancing the competing economic interests of parts and vehicle manufacturers, Congress' concern that consumers be insulated from protracted battles over the performance of their cars' emissions systems, and the overriding purpose of the Clean Air Act to ensure the high quality of the air we breathe. In general, we uphold the agency's certification scheme and commend its efforts to work with representatives of the affected industry to develop a workable and effective program. The certification regulations fall short, however, in their failure to address the practical effects of the certification and performance warranty requirements on various segments of the affected industries.

The standards for certification and the broad scope of certification envisioned by EPA are consistent with the applicable provisions of the Clean Air Act. The agency acted within its statutory authority in proposing a reimbursement scheme, but its failure to address important deficiencies in that scheme was arbitrary and capricious. Finally, the blanket exclusion of specialty parts from the certification program and the rejection of the use of short tests as a basis for certification were arbitrary and capricious. We have considered the other claims raised by petitioners and find them to be without merit.

We remand to the agency for development of a fair and workable reimbursement scheme. Without such a scheme, vehicle manufacturers cannot be held liable for performance warranty claims triggered by the failure of a certified part. With regard to the labelling and identification of certified parts, we direct the agency to determine the feasibility of requiring labels to be durable. We also remand for reasoned explanations of the agency's decisions to prohibit specialty parts from participating in the program through the FTP method of certification and to reject the use of short tests as an alternative basis for certification. Because we hold that vehicle manufacturers will be liable for the failure of a certified part only if a workable reimbursement scheme is set up, MVMA's claim that the performance warranty requirement takes their property without just compensation, in violation of the Fifth Amendment, is without merit. We affirm the certification regulations in part, and vacate those portions dealing with the reimbursement scheme, the treatment of specialty parts (including the role of short tests as an alternative basis for certification), and the labelling requirements.

*It is so ordered.*

MacKINNON, Senior Circuit Judge (concurring):

I join the foregoing opinion and write separately to express a few comments about the reimbursement phase of the decision. As I view it, a workable reimbursement plan is a necessary, very important and very difficult feature of the regulatory

scheme. In my view providing for exclusive jurisdiction in the federal courts over unpaid reimbursement claims against aftermarket parts manufacturers could inundate the federal courts with small claims. I suggest that the agency consider establishing, as the initial and primary disputes mechanism, an arbitration procedure with arbitrators selected by the parties according to a plan established by the regulations. As an additional and alternative mechanism the agency might consider requesting Congress to confer jurisdiction on state and local courts in such cases.[1]

To my mind the agency should also give serious consideration to the possibility of imposing a bond requirement in addition to the disputes procedure. I believe that a reasonable bond requirement would have great potential merit. The criticism that some aftermarket parts manufacturers might not be able to afford to post bond may be correct, but it is just those manufacturers who could not afford to post a bond who need to be weeded out. Moreover, a bond should not be viewed to operate solely as a substitute for financial responsibility; a bond that might be resorted to if a manufacturer refuses to pay a claim also operates as an inducement to the manufacturer to pay justifiable claims promptly.

---

1. Federal statutes frequently confer jurisdiction on state courts to hear specific claims created by federal statute. The Federal Employees Liability Act (FELA), 45 U.S.C. § 56, specifically provides that federal court jurisdiction shall be concurrent with that of the states' courts. Cases initiated under the FELA in state courts are non-removable. 28 U.S.C. § 1445. *Dice v. Akron, Canton & Youngstown R.R.,* 342 U.S. 359 (1952), dealt extensively with the jurisdictional aspects of the FELA, and specifically with the duty of state courts to hear such claims.

Another example is the Fair Labor Standards Act, 29 U.S.C. § 216, which provides that actions to recover for violations thereof "may be maintained in any court of competent jurisdiction." Under this provision state courts have been held compelled to hear federal claims. *Johnson v. Butler Bros.,* 162 F.2d 87 (8th Cir. 1947) (Fair Labor Standards Act—enforceable in state court of competent jurisdiction); *McClanahan v. Mathews,* 292 F.Supp. 737 (E.D.

---

Ky.1968); *Carter v. Hill & Hill Truck Line, Inc.,* 259 F.Supp. 429 (S.D.Tex.1966); *Schimerowski v. Iowa Beef Packers, Inc.,* 196 N.W.2d 551 (Iowa 1972). In addition, *Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947), read the Emergency Price Control Act § 205(c), (e) in the same way, and held the state court bound to hear the federal claim. Cases under the Jones Act, 46 U.S.C. § 688, are sometimes heard in state courts by virtue of the "saving clause" in 28 U.S.C. § 1333, which makes admiralty jurisdiction exclusively federal. *P.J. Carlin Constr. Co. v. Heaney,* 299 U.S. 41, 57 S.Ct. 75, 81 L.Ed. 27 (1936); *Shannon v. City of Anchorage,* 478 P.2d 815 (Alaska 1970); *State v. Daggett,* 87 Wash. 253, 151 P. 648 (1915); *cf. Portland Pipe Line Corp. v. Envtl. Improvement Comm'n,* 307 A.2d 1 (Me.), *appeal dismissed,* 414 U.S. 1035, 94 S.Ct. 532, 38 L.Ed.2d 326 (1973).

Under Supreme Court cases such as *Testa v. Katt* and *Dice v. Akron,* state courts are generally obliged to adjudicate federal claims.