**BETHLEHEM STEEL CORPORATION, Petitioner,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

**Save the Dunes Council and Citizens for a Better Environment, Intervenors-Respondents.**

**No. 82–2608.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 30, 1983.

Decided Dec. 13, 1983.

1304

Bryan G. Tabler, Barnes & Thornburg, Indianapolis, Ind., for petitioner.

David T. Buente, Jr., Dept. of Justice, Washington, D.C., for respondent.

Edward W. Osann, Jr., Leydig, Voit, Ossan, Mayer & Holt, Ltd., Chicago, Ill., for Intervenors-respondents.

Before WOOD and POSNER, Circuit Judges, and GORDON, Senior District Judge.*

POSNER, Circuit Judge.

Section 109 of the Clean Air Act, as amended in 1970, required the EPA to establish air quality standards, and section 110 required the states to adopt implementation plans for attaining those standards. See 42 U.S.C. §§ 7409, 7410; *Train v. Natural Resources Defense Council,* 421 U.S. 60, 64–67, 95 S.Ct. 1470, 1474–1476, 43 L.Ed.2d 731 (1975). To speed progress toward attainment Congress in the Clean Air Act Amendments of 1977 added to the Clean Air Act (effective August 7, 1977) section 107(d), 42 U.S.C. § 7407(d), paragraph 1 of which required each state, within 120 days (i.e., by December 7, 1977), to submit to the EPA a list of attainment areas (areas in which the air quality standards had been attained), nonattainment areas, and areas that could not be classified either way on the basis of available information. Another new section, section 172, 42 U.S.C. § 7502, prescribed new, more stringent requirements for state implementation plans in nonattainment areas. Compare 42 U.S.C. § 7410(a). See generally Currie, Air Pollution: Federal Law and Analysis, ch. 6 (1981). The states were given till January 1, 1979, to submit their section 172 plans for such areas (see Pub.L. 95–95, § 129(c) (not codified), 91 Stat. 750–51 (1977); see also 42

U.S.C. §§ 7410(a)(2)(I), 7506(a), 7616(b)), while attainment and unclassifiable areas were made subject to provisions of the 1977 amendments designed to prevent any significant deterioration in air quality, notably section 163, 42 U.S.C. § 7473; see Currie, *supra,* § 7.01, as well as remaining subject to the pertinent requirements of the 1970 amendments, in particular section 110. Complying with section 163 by preventing significant deterioration in the existing quality of the air is of course easier than complying with section 172, whose purpose is to raise air quality above existing levels.

Paragraph 2 of section 107(d) is the key provision in this case: "Not later than sixty days after submittal [by the state] of the list [of attainment, nonattainment, and unclassifiable areas] ... the Administrator shall promulgate each such list with such modifications as he deems necessary. Whenever the Administrator proposes to modify a list submitted by a State, he shall notify the State and request all available data relating to such region or portion, and provide such State with an opportunity to demonstrate why any proposed modification is inappropriate." The question we are asked to decide—one of first impression—is whether the EPA may modify a list *after* promulgation, to change an air quality control region from an unclassifiable to a nonattainment area. (On the evolution of the EPA's policy regarding this and cognate issues, see EPA, Compliance With the Statutory Provisions of Part D of the Clean Air Act, 48 Fed.Reg. 50,686 (Nov. 2, 1983); and for the full text of section 107(d) see the appendix to this opinion.)

When the State of Indiana submitted its original list of air quality control regions, Porter County (on Lake Michigan), which includes the Burns Harbor Works of Bethlehem Steel Corporation, was designated unclassifiable, and it was so designated in the list promulgated by EPA on March 3, 1978, pursuant to section 107(d)(2). Four and a half years later, on August 18, 1982, the EPA reclassified a portion of Porter County that includes the Burns Harbor Works as a

* Hon. Myron L. Gordon of the Eastern District of Wisconsin, sitting by designation.

nonattainment area for particulate matter, and gave the state one year to submit a new implementation plan that would provide for attainment of the federal air quality standards within three and a half years after the EPA approves the plan, which EPA says it will do within six months of submission if the plan is acceptable. EPA, Designation of Areas for Air Quality Standards: Indiana, 47 Fed.Reg. 35,965 (Aug. 18, 1982).

■ Bethlehem Steel asks us to set aside this reclassification order. It bases our jurisdiction on section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), which so far as relevant here gives the courts of appeals review jurisdiction over "final action" by the Administrator. Reclassifying an area as a nonattainment area triggers definite and grave consequences under the 1977 amendments and therefore possesses the requisite finality, as several courts held when review was sought of the EPA's original designations of nonattainment areas pursuant to section 107(d)(2). See *Western Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 807–08 (9th Cir.1980); Currie, *supra*, § 9.08 at p. 9–25 and n. 11. We also think that Bethlehem, as the principal source of particulate emissions in the reclassified area of Porter County (Bethlehem argues that the area was gerrymandered to include the Burns Harbor Works and little else, and whether this argument is correct or not, a question we need not decide, there is no doubt that the Works are the principal polluter in the reclassified area), has standing as an injured party to file this petition. Without some injury, there would be no "case" or "controversy" between Bethlehem and the EPA within the meaning of Article III of the Constitution; but it is inconceivable that the State of Indiana could comply with the requirements of section 172 without taking measures to reduce particulate emissions from the Burns Harbor Works, to the injury of Bethlehem which would incur costs in complying with those measures.

■ The EPA argues that Bethlehem forfeited its right to get judicial review of the reclassification of Porter County as a nonattainment area by not having sought, within section 307(b)(1)'s 60-day time limit, judicial review of the interpretive regulation (40 C.F.R. §. 81.300 (1978)) in which the EPA announced that it could reclassify areas after promulgation of the original list. However, the 60 days for challenging the regulation expired long before the EPA redesignated part of Porter County as a nonattainment area; and Bethlehem was not required to challenge a regulation just because the regulation might some day harm it. Whether or not such a challenge would have had to be dismissed as premature, on which see generally *Roosevelt Campobello Int'l Park Comm'n v. EPA*, 684 F.2d 1034, 1039–41 (1st Cir.1982), it makes no sense at a time of heavy federal judicial caseloads to encourage people to challenge regulations that may never harm them.

■ We come then to the merits of Bethlehem's statutory challenge. The first sentence of section 107(d)(2) requires the EPA's Administrator to promulgate the list of air quality control regions submitted by the state, "with such modifications as he deems necessary," within 60 days of that submission. Although the next sentence merely requires the agency to notify the state before it modifies the state's list, the agency finds in the first word of that sentence—"whenever"—a power of modification without limitation of time. But as used in the sentence, "whenever" seems to mean "in any or every instance in which" —a common usage of the word, see Webster's Third New International Dictionary 2602 (1971)—rather than "at any time." Read naturally, the first sentence requires the EPA to promulgate the list with all necessary modifications within 60 days and the second sentence requires the EPA in advance of promulgation to notify states of its intention to make modifications.

A section-by-section analysis of the bill that became section 107(d), prepared by committee staff, supports this reading. It says, "The Administrator shall promulgate such list within 60 days with any necessary modifications, after notifying and receiving any comment from the State." Staff of

Subcomm. on Environmental Pollution of the S. Comm. on Environment and Public Works, A Section-by-Section Analysis of S. 252 and S. 253 Clean Air Act Amendments, 95th Cong., 1st Sess. 1 (Feb.1977). And in summarizing the provisions of the bill, the committee reports do not even bother to mention the "whenever" sentence, which makes it unlikely that it was intended to have the dramatic effect that EPA ascribes to it. See S.Rep. No. 127, 95th Cong., 1st Sess. 21 (1977); H.R.Conf.Rep. No. 564, 95th Cong., 1st Sess. 123 (1977); U.S.Code Cong. & Admin.News 1977, p. 1077. Furthermore, paragraph 5 of section 107(d) provides that "A *State* may from time to time review, and as appropriate revise and resubmit, the list required under this subsection. The Administrator shall consider and promulgate such revised list in accordance with [paragraph 2 of] this subsection." (Emphasis added.) This would have been the natural place to empower the Administrator to revise the list.

It is true that another provision in the 1977 amendments, section 171, 42 U.S.C. § 7501(2), defines nonattainment area as "an area which is shown by monitored data or which is calculated by air quality modeling (or other methods determined by the Administrator to be reliable) to exceed any national ambient air quality standard ..." and also states that the "term includes any area identified under" section 107(d). Since section 171 neither refers to a time limit nor suggests that section 107(d) provides the only procedure for designating an area as a nonattainment area, it can be argued that any time the EPA finds that an area has become a nonattainment area it can reclassify it. See Currie, *supra*, § 6.04 at p. 6–12. But there is no indication that Congress intended section 171, a definitional provision, to nullify the time limits in section 107(d). The apparent purpose of section 171, suggested by its caption ("Definitions"), is the modest one of defining "nonattainment area," not the ambitious one of creating an alternative procedure for reclassifying areas as attainment areas. No procedures for reclassification are set forth other than in section 107(d).

Although the statute does not seem to support the EPA's action, we are told that we must read an implicit authorization into the statute in order to close a loophole: If the State of Indiana, determined to frustrate section 107(d), had back in 1977 submitted to the EPA a list of its air quality control regions in which every one was designated as unclassifiable, though the state well knew that most of them really were nonattainment areas, the EPA would not have had enough information to be able to modify the list within 60 days, and would have had to promulgate the list as submitted. But this leaves out of account the fact that a state must submit with its list "a summary of the available information." 42 U.S.C. § 7407(d)(1). We need not speculate on the consequences if the state omits the required summary, for there is no contention that the State of Indiana did so when it submitted its original list to the EPA showing Porter County as an unclassifiable area, or that the state was then or at any other time acting in bad faith. If the information available to the state and submitted with the list back in 1977 had shown that any air quality control region was improperly classified, the EPA should have had no difficulty in reclassifying it within 60 days.

True, if those data did not exist then— the only situation in which designation of an area as unclassifiable would be proper— the EPA probably would not have been able to reclassify an area within the 60-day period. But that would not create a loophole in the sense of an unintended gap in the statute's coverage. The 1977 amendments were not meant to be the primary source of the EPA's power to deal with industrial ("stationary source") air pollution, though their practical significance has turned out to be very great. The basic scheme of federal regulation had been set in the 1970 amendments to the Clean Air Act, under which the State of Indiana was required to and did submit for the EPA's approval a state implementation plan that included Porter County, see 42 U.S.C. § 7410(a)(1), a plan the EPA could always require the

state to revise if the EPA found the plan to be inadequate (see 42 U.S.C. § 7410(a)(2)(H)(ii)) and can still order the state to revise, as we shall see.

Porter County was not unregulated in 1977. The only question was whether it should be put on the fast track that the 1977 amendments established for nonattainment areas known to be such on the basis of data in existence on August 7 of that year. The Senate Report states: "There is sufficient information to implement this provision [section 107(d)]. Those regions with the most serious transportation-related pollution problems have already been identified. The States by and large know where air quality is cleaner than the standards for sulfur oxides or particulates. In the absence of information to the contrary, a region would be assumed 'clean' and placed automatically in the category which subjects the region to provisions preventing significant deterioration of air quality. This provides a prudent step in the absence of knowledge." S.Rep. No. 127, *supra*, at 22. See also Section-by-Section Analysis, *supra*, at 1.

Moreover, the 1977 amendments established deadlines for compliance with the new regulatory requirements that would have made no sense except on the assumption that they were meant to apply only to areas for which additional data were not required in 1977 to establish a need for new regulation. Recall that the state had only 120 days to submit its list and the EPA only 60 days after that to promulgate it. (In fact these deadlines were allowed to slip; slippage of statutory deadlines has been a recurrent feature of the EPA's regulation of air pollution.) And each state was required to submit a new implementation plan for nonattainment areas less than a year after promulgation of the list (by January 1, 1979), and the plan had to require attainment of the national primary ambient air quality standards within another three years (by December 31, 1982). See section 172(a)(1), 42 U.S.C. § 7502(a)(1). There is no room in such a timetable, even liberally interpreted as apparently the practicalities of pollution regulation imperatively de-

mand, for the EPA to collect and analyze new data for the purpose of classifying areas that could not be classified on the basis of 1977 data. When, five years later, the EPA classified part of Porter County as a nonattainment area, there were only a few months left to meet one of the principal deadlines in the 1977 amendments—the December 31, 1982, deadline. It was unrealistic to expect the area to be brought into compliance with those standards so soon, since the state had first to submit and get approval of a new implementation plan. So the EPA made up the new deadlines mentioned earlier in this opinion. In doing so it went outside the 1977 amendments.

■ True, in allowing states to submit revised lists to the EPA without limit of time, section 107(d)(5) implies that the EPA has some authority to modify the statutory deadlines, as it did (as we have seen) at the time of the original submissions. But there is a difference between bending the deadlines at the behest of states and imposing on the states deadlines not provided for in the statute. Although the successive waves of amendments to the Clean Air Act have progressively enlarged the role of the EPA relative to that of state regulators, it is still the case that the Act strikes a careful balance between federal and state power. Section 101(a)(3), 42 U.S.C. § 7401(a)(3), provides "that the prevention and control of air pollution at its source is the primary responsibility of States and local governments," and section 107(a), 42 U.S.C. § 7407(a), provides that "Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan ...." See also S.Rep. No. 127, *supra*, at 10–11; Lave & Omenn, Clearing the Air: Reforming the Clean Air Act 6 (Brookings Institution 1981) (tab. 1); Smith, *Opening Address: Reflections on Federalism, in The New Federalism in Environmental Law: Taking Stock,* 12 Environmental L.Reptr. 15067, 15068 (1982). The states naturally were concerned with the potential impact of stringent anti-pollution measures on pro-

duction and employment, see, e.g., H.R.Rep. No. 294, 95th Cong., 1st Sess. 210 (1977); Melnick, Regulation and the Courts: The Case of the Clean Air Act 36 (1983), and it was in deference to their concern that the Act and its amendments established a scheme of cooperative state and federal regulation rather than of purely federal regulation as in so many other areas, such as railroad regulation. The states were given the initiative to formulate the basic regulatory program—the implementation plans—subject to federal review.

We doubt that the legislators who insisted on reserving so much power to the states would have agreed to give the EPA the power it is claiming in this case—the power to make the states comply with the toughest requirements in the statute long after the statutory deadline for imposing those requirements has expired. That is a formidable power to derive by inference. The statute might be more effective in reducing air pollution if the EPA had this power but we would be upsetting the balance of power embodied in the legislation, rather than merely completing the legislative scheme, if we allowed the EPA to act without a clearer statutory authorization than we can find. Section 107(d) is described in the Section-by-Section Analysis, *supra*, at 1, as "not controversial." It would have been extremely controversial had the EPA's interpretation been foreseen.

■ But the EPA argues that we must defer to an agency's interpretation of the statute it enforces. Reviewing courts often do this, of course, see, e.g., *Blum v. Bacon*, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982); *Mobil Oil Corp. v. EPA*, 716 F.2d 1187, 1189 (7th Cir.1983); *American Trucking Ass'n v. United States*, 688 F.2d 1337, 1341–42 (11th Cir.1982), cert. granted, —— U.S. ——, 103 S.Ct. 3109, 77 L.Ed.2d 1365 (1983); *Chicago & N.W. Transport. Co. v. Atchison, Topeka & Santa Fe Ry.*, 609 F.2d 1221, 1226 (7th Cir.1979), but the basis for this deference (so far as is relevant to this case) also indicates its limits: "it is only logical that courts of general jurisdiction should give deference on matters that are more fully understood by specialist agencies." *Dow Chem. Co. v. EPA*, 605 F.2d 673, 681 (3d Cir.1979). See also 2 Davis, Administrative Law Treatise § 7.13 at p. 59 (1979). The issue here is not a technical one at all. And where a statute strikes a political balance but administration of the statute is entrusted to an agency that may not embody that balance, it is dangerous to defer automatically to the agency's view. An agency that may be dominated by one faction in the legislative struggle that led to enactment of a compromise is not authorized to hand that faction a victory that was denied it in the legislative arena through the efforts of another faction. The court must enforce the compromise, not the maximum position of one of the interest groups among which the compromise was struck. See *Morrison-Knudsen Construction Co. v. Director, Office of Workers' Compensation Programs*, —— U.S. ——, 103 S.Ct. 2045, 2052, 76 L.Ed.2d 194 (1983); *NLRB v. Rockaway News Supply Co.*, 197 F.2d 111, 115–16 (2d Cir.1952) (dissenting opinion), aff'd on other grounds, 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953). Cf. *United States v. Armour & Co.*, 402 U.S. 673, 681–83, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1970).

■ Even if, as we hold, the EPA cannot add to the list of nonattainment areas, it is not helpless to deal with air pollution in Porter County or elsewhere. Section 110(a)(2)(H) of the Clean Air Act provides (with an immaterial exception) "for revision, after public hearings, of the state implementation plan ... whenever the Administrator finds on the basis of information available to him that the plan is substantially inadequate to achieve the national ambient air quality primary or secondary standard which it implements." The State of Indiana has filed a state implementation plan under the 1970 amendments, and if, as the EPA must believe, that plan is substantially inadequate to bring Porter County into compliance with federal air quality standards, and if the state refuses to revise the plan in accordance with section

110(a)(2)(H), the EPA can revise the plan itself. See section 110(c)(1)(C), 42 U.S.C. § 7410(c)(1)(C); Compliance With the Statutory Provisions of Part D of the Clean Air Act, *supra,* 48 Fed.Reg. at 50,687. The EPA's powers under section 110 are not so extensive as under section 172, but they are not negligible.

The order under review exceeded the agency's power and must be vacated. No other issues need be discussed; the various motions before us concern issues that are moot in light of our disposition, and they are therefore dismissed as moot.

### APPENDIX

Clean Air Act, as amended, § 107(d), 42 U.S.C. § 7407(d).

(d) List of noncomplying regions

(1) For the purpose of transportation control planning, part D (relating to nonattainment), part C (relating to prevention of significant deterioration of air quality), and for other purposes, each State, within one hundred and twenty days after August 7, 1977, shall submit to the Administrator a list, together with a summary of the available information, identifying those air quality control regions, or portions thereof, established pursuant to this section in such State which on August 7, 1977—

(A) do not meet a national primary ambient air quality standard for any air pollutant other than sulfur dioxide or particulate matter;

(B) do not meet, or in the judgment of the State may not in the time period required by an applicable implementation plan attain or maintain, any national primary ambient air quality standard for sulfur dioxide or particulate matter;

(C) do not meet a national secondary ambient air quality standard;

(D) cannot be classified under subparagraph (B) or (C) of this paragraph on the basis of available information, for am-

bient air quality levels for sulfur oxides or particulate matter; or

(E) have ambient air quality levels better than any national primary or secondary air quality standard other than for sulfur dioxide or particulate matter, or for which there is not sufficient data to be classified under subparagraph (A) or (C) of this paragraph.

(2) Not later than sixty days after submittal of the list under paragraph (1) of this subsection the Administrator shall promulgate each such list with such modifications as he deems necessary. Whenever the Administrator proposes to modify a list submitted by a State, he shall notify the State and request all available data relating to such region or portion, and provide such State with an opportunity to demonstrate why any proposed modification is inappropriate.

(4)[1] Any region or portion thereof which is not classified under subparagraph (B) or (C) of paragraph (1) of this subsection for sulfur dioxide or particulate matter within one hundred and eighty days after August 7, 1977, shall be deemed to be a region classified under subparagraph (D) of paragraph (1) of this subsection.

(5) A State may from time to time review, and as appropriate revise and resubmit, the list required under this subsection. The Administrator shall consider and promulgate such revised list in accordance with this subsection.

---

**1.** So in original. Subsec. (d) enacted without a par. (3).