**ILLINOIS ENVIRONMENTAL PROTECTION AGENCY, Petitioner,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. 89–1883.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 16, 1990.

Decided Nov. 5, 1991.

go, Ill., Christine Zeman, Asst. Atty. Gen., Office of the Atty. Gen., Crim. Appeals Div., Springfield, Ill., and Richard Cappalli (argued), Philadelphia, Pa., for petitioner.

Don R. Clay, Jane C. Souzon, E.P.A., Gary S. Guzy (argued), Karen L. Egbert, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., Richard J. Carlson, E.P.A., Region 5, Office of the Regional Counsel, and Elizabeth R. Schenkier, Chicago, Ill., for respondent.

Before BAUER, Chief Judge, MANION and KANNE, Circuit Judges.

KANNE, Circuit Judge.

After the United States Environmental Protection Agency (the "US–EPA") denied the Illinois Environmental Protection Agency's (the "IL–EPA") fiscal year 1988 supplemental grant application, the IL–EPA filed a petition for review of the federal agency's final action. The IL–EPA argues that the US–EPA unlawfully diverted state grant funds to federal programs; specifically, it contends that the US–EPA's set-aside or reallocation regulation, 40 C.F.R. § 35.110, was not authorized by the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*, and violates the Fiscal Year 1988 Appropriations Act. We deny the petition for review.

## I.

Established to institute a comprehensive program for controlling and improving the nation's air quality, the Clean Air Act relies on a joint effort by the states and the federal government to implement its provisions. Under the Act, the US–EPA is responsible for identifying air pollutants—such as ozone, carbon monoxide, sulfur dioxide and particulates—that endanger the public health or welfare, determining what concentrations of those pollutants are safe, and promulgating such determinations as National Ambient Air Quality Standards ("NAAQS"). 42 U.S.C. §§ 7408–09. The individual states, however, bear the responsibility of ensuring that their ambient air meets the appropriate NAAQS. 42 U.S.C. § 7407(a).

Michelle D. Jordan, Matthew Dunn, Asst. Atty. Gen., Office of the Atty. Gen., Chica-

To achieve this goal, the Act requires each state to draft a state implementation plan ("SIP") that provides "for implementation, maintenance, and enforcement" of the air quality standards within nine months of their promulgation by the US–EPA. 42 U.S.C. § 7410(a). The individual SIPs must meet various requirements; among other things, each must include "emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of" the NAAQS, 42 U.S.C. § 7410(a)(2)(B), and to attain the ambient air quality standards as expeditiously as practicable but, in any event, by certain prescribed dates. In addition, a SIP must include a provision requiring the state to revise its plan when the Administrator finds that a previously-approved SIP is inadequate to attain the relevant NAAQS. 42 U.S.C. § 7410(a)(2)(H). After the submission of the state's plan, the Administrator is then required to approve or disapprove the plan. 42 U.S.C. § 7410(a)(1). In the event a state fails to submit an adequate SIP, section 110 of the Act requires the US–EPA's Administrator to promulgate appropriate federal implementation plans. 42 U.S.C. § 7410(c)(1).

In 1971, the US–EPA first established an ambient air quality standard for photochemical oxidants including ozone. When this provision and many initial SIPs proved to be ineffective, the Congress amended the statute in 1977 to better address the non-attainment of the NAAQS for ozone. Under the amended statutory provision, the US–EPA was required to designate areas not meeting the relevant air quality standard for each pollutant as "non-attainment." 42 U.S.C. § 7407(d). In January, 1979, the Congress directed the states to submit revised SIPs providing for the attainment of the primary standard in nonattainment areas "as soon as practicable," but no later than December 31, 1982.

The State of Illinois, like many other states, found it difficult to comply with the US–EPA's ambient air quality standard for ozone. In 1978, the US–EPA designated the Chicago area as a "nonattainment area" because it had failed to meet the ozone NAAQS as required by the Act. *See* 42 U.S.C. § 7407(d). Anticipating that it would be unable to attain the ozone standard by December 31, 1982, Illinois requested (and received) an extension of the applicable attainment date from the US–EPA.

Illinois submitted its initial ozone SIP for the Chicago nonattainment area in 1979, and later draft revisions in 1982. In February 1983, the US–EPA proposed to disapprove Illinois' 1982 draft SIP revision because, among other things, it did not contain a legally enforceable commitment to implement "Reasonably Available Control Technology" necessary to control emissions of volatile organic compounds, failed to implement a vehicle inspection and maintenance program which the state had pledged to include in its 1979 plan, and did not sufficiently demonstrate a likelihood of attaining the ozone NAAQS. 48 Fed.Reg. 5,112 (Feb. 3, 1983).

Over the next five years, the IL–EPA negotiated with the US–EPA over how it could improve its SIP to meet the requirements of the Act. These negotiations, however, failed to produce a satisfactory SIP and the US–EPA proposed to disapprove the Illinois plan again in 1987 for failure to satisfy the requirements of Part D of the Act. 52 Fed.Reg. 26,424 (July 14, 1987). In support of its disapproval, the US–EPA noted that the plan did not persuasively demonstrate that the Chicago area would attain the ozone standard by December 31, 1987, or by any fixed near-term date thereafter as required by the Act. *Id.* at 26,425. On October 17, 1988, the US–EPA took final action to disapprove the Chicago portion of the Illinois ozone SIP and to extend the pre-existing construction ban of new and modified major emission sources of volatile organic compounds. 53 Fed.Reg. 40,415 (Oct. 17, 1988).

Prior to the US–EPA's final disapproval of the Illinois ozone SIP, the state of Wisconsin brought suit against the US–EPA, seeking to compel it to disapprove the Illinois SIP for ozone. The lawsuit also asked the court to require the US–EPA to promulgate a substitute federal implemen-

tation plan ("FIP") for the Chicago non-attainment area that would meet the ozone NAAQS. In early 1989, a district court in the Eastern District of Wisconsin ordered the US–EPA to promulgate such a plan by March 1990.

## II.

The costs of developing SIPs and complying with the national ambient air quality standards are considerable. Recognizing this, the federal government authorizes the US–EPA Administrator to make grants to "air pollution control agencies in an amount up to two-thirds of the cost of planning, developing, establishing, or improving ... programs for the prevention and control of air pollution or implementation of national primary and secondary ambient air quality standards." 42 U.S.C. § 7405(a)(1)(A). Grants made under the Act are conditional; the Administrator "may make grants," *id.*, and is to make these grants "upon such terms and considerations as the Administrator may find necessary to carry out the purpose of this section." 42 U.S.C. § 7405(b). Thus, the Act does not vest the states with a right to receive these funds.[1]

In 1982, the US–EPA promulgated regulations implementing section 105 of the Act, 42 U.S.C. § 7405. *See* 47 Fed.Reg. 44,954 (Oct. 12, 1982); 40 C.F.R. pt. 35, subpt. A (State and Local Assistance: Financial Assistance for Continuing Environmental Programs).[2] Under these regulations governing the Clean Air Act's grant funding program, each state receives an annual allotment which represents the amount of financial assistance potentially available to the state under this program. This allotment figure is generally based on an estimate of the extent to which a state

can accomplish the various activities identified by the EPA as priority activities for that fiscal year, as well as on the grantee's prior performance in meeting its statutory obligations. 40 C.F.R. §§ 35.105, 35.110(a), 35.115. The US–EPA Regional Administrators then determine how much of the allotment money a state is likely to be able to use effectively in carrying out priority activities in the coming year and suggests to the state that it apply for this amount, known as the "planning target." 40 CFR §§ 35.105, 35.110(a), 35.120. The states, however, remain free to apply for the full amount of their allotment.

The regulations also permit the US–EPA to reallocate unawarded funds in order "to achieve the objectives for which Congress appropriated them." 40 C.F.R. § 35.155. Thus, the regulations further provide that the Regional Administrator may use unawarded funds to finance "a federal program required in the absence of an acceptable state program," 40 C.F.R. § 35.110(d), or may use such funds to support a Federal program required by law in that state in the absence of an acceptable state program. 40 C.F.R. § 35.155(a).

In July 1985, the Regional Administrator for EPA Region V informed the IL–EPA that it intended to reduce state-specific fiscal year 1986 grant awards throughout the Region.[3] In its notice, the US–EPA indicated that its actions were pursuant to its set-aside regulations governing grant funding. *See* 40 C.F.R. pt. 35, subpt. A, § 35.155, § 35.110. According to the US–EPA, the reservation of funds was necessary to cover the federal government's cost of promulgating state implementation plans when and if necessary to meet the requirements of the Clean Air Act. In addition, the US–EPA stated that the reserved funds

---

**1.** An allotment is "not an entitlement but rather the objective basis for determining the range for a state's planning target." 40 C.F.R. §§ 35.105, 35.155. Recognizing that the structure and wording of the Act does not vest the state with an absolute right to receive these funds, the IL–EPA does not claim that the US–EPA must award it the grant funds in dispute. Rather, it maintains that the federal agency's diversion of section 105 grant funds is illegal. Its injury, therefore, arises out of its inability to compete

for these unawarded funds, which would otherwise be potentially available to fund state environmental programs.

**2.** The set-aside regulations applied to nine different continuing assistance programs administered by the US–EPA.

**3.** Region V includes Illinois, Indiana, Ohio and Michigan.

would be used to secure contractor assistance to support any federal promulgation efforts. However, if the federal agency's anticipated obligations did not arise, the US–EPA indicated the withheld funds would be returned to the state.

Beginning in 1986, the US–EPA set aside 2.85% of the annual allocations for each of the four states in Region V because it was uncertain whether these states would be able to comply with the requirements of the Act. Each subsequent fiscal year the US–EPA reaffirmed its policy of not making a state's total grant allotment available because of delays in SIP promulgation and the resulting potential for federal promulgation. In later years though, the US–EPA set aside varying amounts of the grant funds allocated for each of the four states.

In 1987, the US–EPA informed the IL–EPA that its planning target allotment would be slightly over five million dollars. But the US–EPA indicated that it planned to set aside part of Illinois' allotment in case it was required to promulgate SIPs for the state. Protesting the agency's action, the IL–EPA filed a second grant application for $128,333 (the amount estimated by the IL–EPA to represent the balance of its fiscal year 1988 allotment). Stating that the requested funds had been reserved for a contingency fund needed "to support a federal program required by law in the absence of an acceptable state program," the US–EPA's Regional Administrator denied the grant application. The Region V Administrator denied the IL–EPA's request for reconsideration; the US–EPA later affirmed this denial. The IL–EPA then brought this petition seeking review of the final action of the US–EPA.

### III.

■ Before reaching the merits, we must first address a two-pronged challenge to our jurisdiction over this case. The US–EPA maintains that the IL–EPA failed to comply with the venue and temporal restrictions placed on judicial review of the its regulations by § 307(b)(1) of the Act.[4] Specifically, it argues that the IL–EPA was required to mount this challenge to the lawfulness of the US–EPA's set-aside regulation over seven years ago in the Court of Appeals for the District of Columbia.

---

4. Section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1) provides:

A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 112 [42 USCS § 7412], any standard of performance or requirement under section 111 [42 USCS § 7411][,] any standard under section 202 [42 USCS § 7521] (other than a standard required to be prescribed under section 202(b)(1) [42 USCS § 7521(b)(1)]), any determination under section 202(b)(5) [42 USCS § 7521(b)(5)], any control or prohibition under section 211 [42 USCS § 7545], any standard under section 231 [42 USCS § 7571] any rule issued under section 113, 119, or under section 120 [42 USCS § 7413, 7419, or 7420], or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this Act may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 110 or section 111(d) [42 USCS § 7410 or 7411(d)], any order under section 111(j) [42 USCS § 7411(j)], under section 112(c) [42 USCS § 7412(c)], under section 113(d) [42 USCS § 7413(d)], under section 119 [42 USCS § 7419], or under section 120 [42 USCS § 7420], or his action under section 119(c)(2)(A), (B), or (C) (as in effect before the date of enactment of the Clean Air Act Amendments of 1977) or under regulations thereunder, or any other final action of the Administrator under this Act (including any denial or disapproval by the Administrator under title I [42 USCS §§ 7401 et seq.]) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise.

We begin by addressing the issue of whether the IL–EPA's petition is timely under the temporal restrictions which the Clean Air Act places on review of actions by the US–EPA. While the Act provides several alternative avenues for judicial review, only two are relevant to this case.[5] Under the first type of review—promulgation review—"[a] petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard ... may be filed only in the United States Court of Appeals for the District of Columbia.... within sixty days from the date of notice." 42 U.S.C. § 7607(b)(1). The US–EPA gave notice of the set-aside regulation in 1982 when it published the regulation in the Federal Register. As a result, the IL–EPA's petition for review, filed substantially more than sixty days after the date of notice, was untimely under the provision governing promulgation review. Thus, if this were the sole avenue of judicial review available to the IL–EPA, we would agree that we lacked jurisdiction to consider the IL–EPA's petition.

The Act, however, also provides a second route for obtaining judicial review of actions taken by the US–EPA. Under § 307(b)'s provision for "implementation" review, "[a] petition for review of ... any ... final action of the Administrator ... which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit ... within sixty days from the date of notice." In this case, the IL–EPA appeals from the US–EPA's denial of its fiscal year 1988 grant request—a final action of local or regional applicability. The IL–EPA brought this petition within sixty days of the US–EPA's denial of its grant request; accordingly, the IL–EPA's petition would appear to be timely under this statutory provision for judicial review.

But while the Act's provision allowing implementation review seemingly permits the IL–EPA to challenge the set-aside regulation now, the US–EPA nonetheless maintains that the set-aside regulation is nationally applicable and any challenge to its validity was required to be brought within 60 days of its promulgation. Circuit precedent, however, clearly refutes the US–EPA's position. In *Bethlehem Steel Corp. v. United States Environmental Protection Agency*, 723 F.2d 1303 (7th Cir. 1983), a factually similar case, this court rejected the US–EPA's identical jurisdictional argument and permitted the petitioner to challenge a US–EPA regulation empowering the agency to reclassify an area originally designated as "unclassifiable" as a "nonattainment." There, as in this case, the US–EPA argued that § 307(b) of the Clean Air Act required the petitioner to challenge the regulation in dispute within 60 days of its promulgation; therefore, it maintained that the steel company could not obtain implementation review of the reclassification order. In rejecting the agency's position, we stated:

> Bethlehem was not required to challenge a regulation just because the regulation might some day harm it. Whether or not such a challenge would have to be dismissed ..., it makes no sense at a time of heavy federal judicial caseloads to encourage people to challenge regulations that may never harm them.

*Id.* at 1306; *see also Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028, 1033 (7th Cir.1984) (Bethlehem Steel "had no actual controversy with the EPA at that time and could not be faulted for not suing then even if air pollution regulations must always be challenged at the earliest possible opportunity."); *but see Puerto Rican Cement Co. v. United States Environmental Protection Agency*, 889 F.2d 292 (1st Cir. 1989).

The same conclusion is warranted in this case. Just as in *Bethlehem Steel*, it makes no sense to require the IL–EPA to have challenged the set-aside regulation in 1982 when it was unsure of what impact, if any,

---

5. This is not an enforcement action, so § 307(b)(2), 42 U.S.C. § 7607(b)(2), is not applicable. In addition, both parties agree that this case does not involve new information which would bring the case under the last sentence of § 307(b)(1) which permits judicial review "if such petition is based solely on grounds arising after such sixtieth day."

the regulation would have on it in the future. Although the IL–EPA may have disagreed with the reallocation regulation at the time of its promulgation, it was not harmed by the regulation until the US–EPA applied the set-aside provision and denied grant funding to the IL–EPA. Moreover, as the IL–EPA notes, only a party with clairvoyant powers could have "contemplated that it would fail to meet a compliance deadline still five years away, ... [that] the federal government would decide (or be forced) to begin a federal implementation process, and that the US–EPA might invoke ... the 1982 rules to support funding such [a] process with dollars taken from Illinois' annual clean air grant allocation." Finding the court's reasoning in *Bethlehem Steel* to be equally persuasive in this case, we conclude that the IL–EPA's request for implementation review challenging the set-aside regulation is timely.

■ *Bethlehem Steel* likewise disposes of the US–EPA's argument that the IL–EPA brought this action in the wrong court. Like the petitioner in *Bethlehem Steel,* here the IL–EPA seeks review of a purely local decision—the Regional Administrator's denial of its grant request. Accordingly, as the final action in this case is "locally and regionally applicable," the action was to be filed in the appropriate circuit court. 42 U.S.C. § 7606(b)(1); *cf. Harrison v. PPG Indus., Inc.,* 446 U.S. 578, 590–91, 100 S.Ct. 1889, 1896–97, 64 L.Ed.2d 525 (1980); *Bethlehem Steel,* 723 F.2d at 1306; *but see Puerto Rican Cement,* 889 F.2d 292. We therefore believe that the IL–EPA's petition was properly filed in the Seventh Circuit Court of Appeals.

## IV.

■ Having disposed of the jurisdictional issues, we proceed to the merits of the case. In its petition for review, the IL–EPA maintains that the US–EPA's set-aside regulation, 40 C.F.R. § 35.110,[6] is un-

lawful for two major reasons: it violates both the Clean Air Act and the principle that government funds may only be applied as appropriated by the Congress, 31 U.S.C. § 1301(a). We address each argument in turn.

■ Our scope of review when determining whether a challenged regulation is lawful is well settled. Under the deference principles established in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), we must engage in a two-step analysis when reviewing the US–EPA's construction of its powers under the Clean Air Act. "In determining whether a challenged regulation is valid, a reviewing court must first determine if the regulation is consistent with the language of the statute." *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). If Congress has clearly spoken on the issue in question, our inquiry is at an end for "that intention is the law and must be given effect." *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9. ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."). To ascertain the intent of the law, we must examine the plain meaning of the statute at issue, the language and design of the statute as a whole, *K Mart Corp.,* 486 U.S. at 291, 108 S.Ct. at 1817, and, where necessary, less satisfactory indicia of congressional intent such as legislative history. *Cf. Bethlehem Steel Corp. v. Bush,* 918 F.2d 1323, 1327 (7th Cir.1990).

■ If, however, the statute is silent or ambiguous with respect to the specific issue addressed by the regulation, a court must proceed to the second step of the *Chevron* test where its inquiry becomes whether the agency regulation is a reasonable and permissible construction of the statute. *K Mart Corp.,* 486 U.S. at 291–92,

---

**6.** The legality of 40 C.F.R. § 35.155 is not at issue in this petition. Section 35.155 permits the US–EPA's regional administrators to reallocate funds at "the end of the year." In the

present case, the US–EPA announced its intention to reallocate these § 105 funds at the beginning of the year, rendering § 35.155 inapplicable.

108 S.Ct. at 1817; *NLRB v. United Food & Commercial Workers Union, Local 23,* 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987); *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781–82; *Wisconsin Elec. Power Co. v. Reilly,* 893 F.2d 901, 906–07 (7th Cir.1990); *Bethlehem Steel Corp. v. Bush,* 918 F.2d 1323, 1328 (7th Cir.1990); *Simmons v. Interstate Commerce Comm'n,* 808 F.2d 22, 24 (7th Cir.1986). Although the US–EPA does not have "unbridled discretion to construe the Clean Air Act Amendments," *see Wisconsin Elec. Power Co.,* 893 F.2d at 907, its interpretation is entitled to great deference, *Cerro Copper Prod. Co. v. Ruckelshaus,* 766 F.2d 1060, 1067 (7th Cir.1985), and we will not "substitute our judgment for that of the EPA." *Interstate Commerce Comm'n v. Mr. B's Serv., Ltd.,* 934 F.2d 117, 121 (7th Cir.1991) ("We need not conclude that the agency's construction is the only one it could have adopted, or that we would have reached the same result") (citing *Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11); *Wisconsin Elec. Power Co.,* 893 F.2d at 907. We proceed to review the challenged regulation under this standard of review.

In this case, the statute is silent on the issue of whether Congress intended to permit the US–EPA to set aside § 105 grant funds in order to cover the expenses of promulgating federal implementation programs required in the absence of satisfactory state plans. No provision of the Clean Air Act either expressly forbids or permits the US–EPA to reallocate state grant funds. Accordingly, we must look to the statutory scheme of the Clean Air Act to better establish the intent of the Congress. *K Mart Corp.,* 486 U.S. at 291, 108 S.Ct. at 1817.

The IL–EPA also argues that the reallocation regulation is contrary to congressional intent because it permits the federal agency to assume powers the Congress intended to remain with the states. True, "the Act strikes a careful balance between federal and state power." *Bethlehem Steel Corp.,* 723 F.2d at 1308. But, the courts have recognized that the US–EPA remains "the ultimate supervisor" for the implementation of the Act. *Duquesne Light Co. v. United States Environmental Protection Agency,* 698 F.2d 456, 461 (D.C.Cir.1983), *petition dismissed after remand,* 791 F.2d 959 (1986). The reallocation regulation narrowly circumscribes the US–EPA's powers. The federal government can intrude on the state's right to design and implement pollution control measures only when the state proves incapable of promulgating a satisfactory SIP. 42 U.S.C. § 7410(c). Moreover, the US–EPA will withhold funds only if it is necessary to fund a statutorily required federal alternative plan. We therefore do not believe that the reallocation regulation upsets the Clean Air Act's balancing of federal and state interests and powers.

Looking next to the legislative history surrounding the Act, we find little or no support for the IL–EPA's argument that the set-aside regulation is not permitted by the Act. In support of its argument, the IL–EPA points to a proposed 1970 amendment to § 105 which would have granted the US–EPA specific authority to withhold funds from states and to make those funds available for federal efforts to implement the Act's requirements in the state. *See* S. 4358, 91st Cong., 2d Sess., 5 (1970), reprinted in 1 *Leg. Hist.* 531, 535 (1974). But, in rejecting the proposed amendment, the conferees acknowledged "that the Administrator has general authority ... to act where a state is not carrying out its enforcement responsibilities." 1970 U.S.Code Cong. & Admin.News 5375. This statement of "legislative intent" does not, however, support the IL–EPA's contention that Congress intended to circumscribe the US–EPA's ability to make withheld grant funds available for federal regulatory efforts. Rather, the cited passage can be read to support the US–EPA's position; if the conferees believed the US–EPA already possessed this authority under § 105, no amendment was needed. Accordingly, the legislative history seems to us to slightly support (or at worst is neutral toward) the US–EPA's position that Congress did not need to take further action because it believed the Ad-

ministrator already possessed the authority to engage in the challenged activity.

Having concluded that the Congress did not speak to the precise issue of whether the US–EPA can set aside § 105 funds, we must defer to the agency's interpretation of its statute if reasonable. And our review of the Act convinces us that the US–EPA's interpretation of its statutory authority is reasonable.

In promulgating the contested regulations, the US–EPA relied on the authority of § 301(a)(1) and § 105 of the Act. *See* Fed.Reg. at 44,954. Section 301 provides that "[t]he Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under [the Act]." 42 U.S.C. § 7601(a)(1); *see, e.g., Specialty Equipment Market Ass'n v. Ruckelshaus,* 720 F.2d 124, 138 (D.C.Cir.1983) (EPA "acted within its statutory authority in developing a reimbursement scheme, even though the statute does not specifically authorize such a scheme."). While § 301 has seemingly unlimited scope, the courts have narrowly construed the extent of this section's reach. *Citizens to Save Spencer County v. United States Environmental Protection Agency,* 600 F.2d 844, 873 (D.C.Cir. 1979) (Section 301 "does not provide the Administrator with *carte blanche* authority to promulgate any rules, on any matter relating to the Clean Air Act."); *cf. In re Permanent Surface Mining Regulation Litig.,* 653 F.2d 514, 523 (D.C.Cir.), *cert. denied,* 454 U.S. 822, 102 S.Ct. 106, 70 L.Ed.2d 93 (1981). Thus, if the US–EPA relied solely upon the provisions of § 301, its authority to promulgate the regulations might be questionable.

The US–EPA, however, also relied on § 105 to support for its authority to implement the regulations at issue. Under § 105(b), the US–EPA's Administrator has broad authority to make grants "upon such terms and conditions ... necessary to carry out the purpose" of § 105. 42 U.S.C. § 7405. If, as the IL–EPA argues, the sole purpose of § 105 was to channel federal funds to the states, the legality of the set-aside regulation might be suspect. But the purpose of § 105 is not so limited; rather,

it is to provide programs for the prevention and control of air pollution and to implement air quality standards within the states. 42 U.S.C. § 7405(a)(1)(A). And here, the reallocation regulation does exactly that. Under the Clean Air Act, the US–EPA is required to develop and promulgate federal implementation plans in the absence of a suitable state plan. As the US–EPA notes, the set-aside regulation furthers this goal: "[t]he regulation simply provides that any uncommitted funds may be used by [the US–]EPA to accomplish what a state has failed to do in cleaning up its air." The regulation further implements the Act's goal of aiding individual states to establish air quality programs since funds withheld from a state are to be used only to provide federal programs in that state. 40 C.F.R. § 35.155.

As our previous discussion concluded, the Clean Air Act neither explicitly authorizes or prohibits the Administrator of the US–EPA from reserving unawarded or uncommitted grant funds to support federal programs required in the absence of satisfactory state programs. The Act vests him with discretion to determine both the specific goals of § 105 and the more general goals of the Act. Because the US–EPA's reallocation regulation furthers both of these sections of the Act, we must defer to the US–EPA's interpretation of the statute. *Cerro Copper,* 766 F.2d at 1067 (7th Cir. 1985). Therefore, we conclude that the US–EPA's set-aside regulation is a permissible interpretation of the authority given it to exercise under the Clean Air Act. *Cf. Specialty Equipment Market Ass'n,* 720 F.2d at 138.

■ The IL–EPA's contention that the set-aside regulation violates the principle that federal agencies may use appropriated funds only for the purposes designated by the Congress is no more persuasive. *See* 31 U.S.C. § 1301(a) (appropriations may be applied only to the "objects for which the appropriations were made"). While the federal government's appropriation process is a morass into which only the politically-adept typically would descend, based on our review of the process and the statute

**292**

cited by the IL–EPA, we do not believe the US–EPA was prohibited from reallocating state grant moneys to fund its promulgation of federal implementation plans for two reasons. First, the FY 1988 Appropriations Act did not earmark a specific sum of money for grants to the states under the Clean Air Act; instead, it indicated that a specific amount was designated for the US–EPA's "Abatement, Control and Compliance" activities. As the US–EPA points out, whether spent to promulgate and implement a FIP or a SIP, these funds go to control and abate air pollution in the states—the express purpose for which they were appropriated. Nor do we believe that the reallocation of funds resulted in an illegal shifting of funds to the US–EPA's "Salaries and Expense" appropriation since the set-aside regulation, 40 C.F.R. subpt. A, specifically prohibit such a transfer. Accordingly, we conclude that the US–EPA's action in reallocating funds did not violate 31 U.S.C. § 1301(a).

Finally, in its briefs, the IL–EPA stressed that it was challenging only the legality of the US–EPA's set-aside policy—not its application to the facts of this case. Therefore, having concluded that the reallocation regulation is lawful, we need not address whether the US–EPA's interpretation of its set-aside regulation was consistent with the language of the regulation.

### V.

For the foregoing reasons, the IL–EPA's petition for review is DENIED.